AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Red iPhone
Seized as FP&F No. 2024565400005901
("Target Device")

Case No. '24 MJ1146

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the  Southern  District of  California , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, U.S.C. § 1324(a)(1)(A)(ii) and (a)(1)(A)(v)(I) | Transportation of Aliens and Conspiracy to Transport Illegal Aliens |
| Title 18 USC 111(a)(1)(b) | Assaulting, Resisting an Officer |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent Shawna M. Wilson, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

James T. Burns, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone   *(specify reliable electronic means)*.

Date: 03/13/2024

*Judge's signature*

City and state: San Diego, California    HON. BERNARD G. SKOMAL, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A

## PROPERTY TO BE SEARCHED

The following property is to be searched:

Red Iphone
Seized as FP&F No. 2024565400005901
(**"Target Device"**)

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

# ATTACHMENT B

## ITEM TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **February 19, 2024, through March 4, 2024**:

    a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

    b. tending to identify accounts, facilities, storage Device, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

    c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

    d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the Target Device; and/or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.

# AFFIDAVIT

I, James T. Burns, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic Device:

> Red iPhone
> Seized as FP&F No. 2024565400005901
> (**"Target Device"**)

the **Target Device**, as further described in Attachment A and to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling) and Title 18 USC 111 (Assault on a Federal Officer) as further described in Attachment B.

2. The requested warrant related to the investigation and prosecution of Roberto JR ROBLEDO, for attempting to transport and move illegal aliens within the United States. The **Target Device** is currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4. I have been employed by the USBP since 2008 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal

1

Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for 15 years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities,

including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as

3

emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

b. tending to identify accounts, facilities, storage Device, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On March 4, 2024, Supervisory Border Patrol Agents (SBPA) A. Rivera, T. White, and Border Patrol Agent (BPA) J. Phung were preforming their assigned duties in the Chula Vista area of responsibility. All agents were in full rough duty uniforms, with official patches, insignias, and badges clearly visible. The agents were driving marked Border Patrol vehicles with operational emergency lights and sirens.

12. At approximately 2:10 p.m., SBPAs Rivera, White, and BPA Phong responded to a Department of Homeland Security (DHS) radio transmission from Remote Video Surveillance System (RVSS) that there was a group of individuals attempting to cross over the United States/Mexico International Boundary fence in an area commonly known to Border Patrol Agents as "Cactus." This area is approximately three miles west of the Otay Mesa Port of Entry and is adjacent to the United States/Mexico International Boundary.

13. This area is a well-known smuggling corridor where noncitizens enter the United States illegally and are picked up by smuggles who transport them further into the interior of the United States. The surrounding area is comprised of warehouses designed for semi tractor-trailers to offload goods coming into the United States from Mexico, located near State Routes 905 and 125. The paved areas around the warehouses are spacious and intended to provide enough room for tractor-trailers to easily maneuver. Smugglers exploit these attributes to conduct their illicit activities in this area.

14. When BPA Phong arrived in the Cactus area, he noticed two noncitizens, later identified as Material Witnesses Ismael GOMEZ-Castrejon and Valentin NICO-Rita, sliding down the secondary fence. BPA Phong detained GOMEZ and NICO in his service vehicle for suspected illegal entry.

15. SBPA Rivera arrived in the Cactus area and observed two vehicles, including a red Ford Focus that swerved around SBPA Rivera's vehicle and rapidly left the area. SBPA Rivera saw that the Ford Focus had a male driver, later identified as Roberto

ROBLEDO JR, and two passengers, later identified as Material Witnesses Alfonso SOSA-Bravo and Marcelo GARCIA-Lozada. SBPA Rivera turned to follow the Ford Focus and saw SBPA White driving into the paved parking area surrounding the warehouses. SBPA White was not blocking the exit and there was plenty of room for ROBLEDO to maneuver the Ford Focus around SBPA White's vehicle.

16. SBPA White entered the Cactus area and noticed the red Ford Focus speeding towards her service vehicle. SBPA White made eye contact with ROBLEDO as he approached and noticed SOSA wearing light colored clothing in the front passenger seat. As SBPA White positioned her vehicle to pursue ROBLEDO, he drove the Ford Focus into her service vehicle, then stopped to allow GARCIA and SOSA to exit and run westbound towards the adjacent warehouses. ROBLEDO then continued driving eastbound on Calle De Linea, then northbound on Cactus St. and out of her sight. SBPA White broadcasted the events via her service radio and gave chase to GARCIA and SOSA on foot.

17. SBPA Rivera and BPA Phung also pursued GARCIA and SOSA. SBPA Rivera discovered SOSA hiding under the wheel well of a tractor trailer container box and detained him. BPA Phong located GARCIA hiding atop an electrical box and detained him.

18. BPA Phong asked GARCIA, SOSA, NICO, and GOMEZ if they had any immigration documents to allow them to enter or remain in the United States legally. All four individuals responded "No" and stated that they are citizens and nationals of Mexico. At approximately 2:45 p.m., BPA Phong arrested GARICA, SOSA, NICO, and GOMEZ for illegal entry.

19. SBPA White returned to her service vehicle (M26242) and waited for (Acting) Watch Commander M. Rucker to arrive and evaluate the damage. The service vehicle sustained a broken suspension, and the front passenger side tire was almost completely dislodged. As the adrenaline wore off, SBPA White started to experience pain and stiffness

in her right wrist and hand. She was transported to Sharp Coronado Hospital Emergency Room that evening by another agent for further evaluation.

20. BPA P. Perez, wearing his rough duty uniform and driving a marked Border Patrol vehicle, arrived at the Cactus area, observed the damage to SBPA White's vehicle, and proceeded to search the area for a red sedan. BPA Perez located the Ford Focus abandoned a short distance away at 6871 Secano St. The car had fresh body damage on the front right bumper and white paint scraping clearly visible. BPA Perez notified agents in the field of his discovery via his service radio.

21. Border Patrol Agent Intelligence (BPA-I) A. Vega arrived on scene where the Ford Focus was abandoned. BPA-I Vega searched the area on foot for ROBLEDO. Agent Djokich searched the Ford Focus, bearing a California plate, for noncitizens and other contraband. Agent Djokich discovered in the vehicle a United States passport bearing the name, date of birth and likeness of Roberto ROBLEDO JR,. Agent Djokich conducted record checks and found that ROBLEDO crossed into the United States through the San Ysidro Port of Entry the day before, March 3, 2024, at approximately 7:42 p.m., driving the red Ford Focus.

22. BPA-I Vega continued to canvass the area for any signs of ROBLEDO. BPA-I Vega noticed a residence approximately 35 feet away from the abandoned Ford Focus, which had a doorbell camara. BPA-I Vega approached the resident and asked if the camara captured any video between the 2:10 and 2:20 p.m. The resident found a video of ROBLEDO walking southbound past the camara at approximately 2:16 p.m. and provided a copy to BPA-I Vega.

23. Record checks revealed ROBLEDO has crossed through Ports of Entry on eight different occasions in the red Ford Focus bearing a California plate. On every occasion ROBLEDO was driving the vehicle, including the night before the assault and smuggling attempt on March 4, 2024. The registered owner of the vehicle is Maria Elizabeth Robledo Ortiz. Record checks confirm the registered owner is ROBLEDO's

7

sisters. Commercial license plate readers captured the vehicle parked in the driveway of the registered address at 11:46 p.m., on March 3, 2024. Further checks revealed Nancy ROBLEDO another sister, also resides at that address.

24. On March 11, 2024, at approximately 12:40 p.m., Border Patrol Agent Intelligence F. Hurtado while assigned to Anti-Smuggling Unit-West, traveled El Cajon, California in search of Roberto ROBLEDO, Jr. an arrest warrant was produced and signed by a U.S. Magistrate judge on March 8, 2024, at approximately 6:17 p.m. for federal violations.

25. At approximately 1:08 p.m., BPA-I Hurtado observed ROBLEDO exiting the address in question and walking northbound on South Mollison Avenue. ROBLEDO was fashioned with a black long-sleeved shirt and off-white color shorts. Agents approached ROBLEDO from different angles to mitigate his chances of potentially absconding. BPA-I Hurtado traveled towards ROBLEDO in his unmarked service vehicle and parked adjacent to him. ROBLEDO stopped and stared at BPA-I Hurtado as he exited his vehicle. As he approached ROBLEDO and asked him if he was Roberto ROBLEDO in the English language. ROBLEDO responded, "Yes" and on his own volition placed his own hands behind his back, predicting the application of handcuffs. In addition, ROBLEDO stated, "I know who you are, and I knew you guys were here."

26. At approximately, 1:09 p.m., BPA-I Hurtado placed ROBLEDO under arrest near ROBLEDO'S sister's residents in El Cajon and the subject matter of the warrant was verbally explained to him. ROBLEDO was exhibited a copy of his warrant incident to his arrest, and he requested an agent to read him the contents of the warrant in the English language.

27. At the time of arrest, a Red iPhone (**Target Device**) was found on ROBLEDO's person. ROBLEDO claimed the phone as his. This device was subsequently seized.

28. The defendant ROBLEDO was read his Miranda Rights and was willing to speak without an attorney present. ROBLEDO admitted he was smuggling illegal aliens on March 4, 2024, and it was his first time. ROBLEDO explained he met a man by the name of "Luis" at the marijuana dispensary. According to ROBLEDO Luis approached him and asked if he wanted to earn some money smuggling illegal aliens. ROBLEDO told Luis he needed money and agreed to do the job. Luis told ROBLEDO to go down to the factory area, pick up the aliens and when he came back Luis was going to pay him $200 USD.

29. On the day of the event, ROBLEDO stated he went down to the border at approximately 2:00 p.m. ROBLEDO admitted after the alien entered his vehicle, he drove around the first agent. ROBLEDO claimed as he was approaching the exit to the parking lot the second agent turned in front of him, and he attempted to apply the brakes, but it was to late and he collided with the second agent. ROBLEDO drove a short distance and stopped. He told the two aliens to exit the vehicle and he drove a short distance and abandoned the vehicle. When asked how he was able to get home, ROBLEDO claimed he took a bus and trolley out of the area. ROBLEDO was asked if he wanted to make any additional statement, he stated he was sorry.

30. Material witness SOSA stated that he is a citizen of Mexico with no legal documents permitting him to enter the United States. He made his smuggling arrangements while still in Michoacan and was going to pay $12,000.00 USD. SOSA stated he made his illegal entry into the United States by scaling two fences using ladders near Tijuana, Mexico, with six people, one of whom was also a passenger in the Ford Focus. SOSA stated that the smugglers put up the ladders and told him and the group that after scaling the fences, there would be a red Ford Focus waiting for them.

31. SOSA stated that he was the first individual to scale the two fences. As he ran towards the Ford Focus, the driver motioned him with his hand to get in the vehicle.

9

According to SOSA, the driver told him to sit in the from passenger seat and instructed him to remove his burgundy jacket, because agents would be looking for someone wearing a burgundy jacket.

32. SOSA stated that only one other individual was able to get in the vehicle because they could hear police sirens getting closer. After the second individual got inside, he stated that the driver sped off only to see a patrol vehicle approaching his location. SOSA stated that as the driver drove around the first patrol vehicle, he hit a second patrol vehicle on the front passenger side tire and bent the tire (disabling the patrol vehicle). SOSA stated that it appeared the driver hit the patrol vehicle intentionally to avoid apprehension. At that point, SOSA stated that the driver told him and the other individual to get out. As he and the other individual exited the vehicle, the driver sped away.

33. SOSA described the driver as a light skinned individual with a regular buzz cut and a light beard wearing a black T-shirt. SOSA was shown a photographic line-up labeled A-1 consisting of six photographs, each numbered one through six. SOSA was unable to positively identify anyone.

34. Material Witness GARCIA stated that he is a citizen of Mexico with no legal documents permitting him to enter the United States. GARCIA made his smuggling arrangements through an individual known to him as "El Chef" via Facebook while he was living in Hildago and was paying $10,000 to be smuggled into the United States.

35. GARCIA stated that he crossed the United States/Mexico International border by using ladders to climb over two fences from Tijuana, Mexico on March 4, 2024, at approximately 2:00 p.m. After climbing over the secondary fence, GARCIA was told to run by the smugglers holding the ladder. As GARCIA ran northbound, GARCIA said the driver of a red four-door vehicle waved to him and told him in Spanish to get in. GARCIA said he was the first person into the vehicle. GARCIA stated the driver told him to lay down and not look around. GARCIA said SOSA also entered the vehicle.

36. GARCIA said soon after the vehicle drove away from the scene he heard and felt it collide with something. GARCIA said the driver screamed at him and SOSA to get out of his vehicle in the Spanish language.

37. GARCIA was shown a photographic lineup labeled A-1, displaying six persons each numbered 1-6. GARCIA did not identify anyone in the photographic lineup.

38. Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Device**. In light of the above facts and my experience and training, there is probable cause to believe that the Defendant was using the **Target Device** to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Device** for data beginning on **February 19, 2024, through March 4, 2024.**

## METHODOLOGY

39. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data

11

contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

40. Following the issuance of this warrant, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

41. Based on the foregoing, identifying, and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

42. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

# CONCLUSION

43. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device** will yield evidence of an alien smuggling violation of Title 8, United States Code, Sections 1324.

44. Because the **Target Device** was seized at the time of the defendant's arrest and has been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Device**. As stated above, I believe that the appropriate date range for this search is from **February 19, 2024, through March 4, 2024.**

45. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A, seize the item listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
James T. Burns
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 13th day of March 2024.

_____
HON. BERNARD G. SKOMAL
United States Magistrate Judge

13

# **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following property is to be searched:

Red Iphone
Seized as FP&F No. 20245654000005901
**("Target Device")**

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

14

# ATTACHMENT B

## ITEM TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **February 19, 2024, through March 4, 2024**:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

b. tending to identify accounts, facilities, storage Device, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.